UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:26-CR-67-REW-HAI |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| AARON WAYNE DICKERSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

This matter is before the Court on Defendant Aaron Wayne Dickerson's motion to suppress evidence obtained from a search of Dickerson's person and the ensuing search of the automobile that he was driving following a traffic stop that occurred on March 25, 2026. *See* DE 25. Co-Defendant Howard Duane Wilson moved to join in the motion to suppress as the alleged owner of (and a passenger in) the vehicle searched by officers on that day, *see* DE 32, and the Court granted that motion without prejudice, *see* DE 34. The Government opposes suppression on several grounds, which the Court addresses below. *See* DE 36. Dickerson replied to the Government's response in opposition. *See* DE 37. Both parties requested an evidentiary hearing, and the Court held such hearing on August 25, 2026. *See* DE 46 (Minute Entry). Following the presentation of all evidence and arguments of counsel, the Court took the suppression motion under advisement. *See id.* at 1. Having considered the pertinent law and evidentiary record, and for the reasons stated below, the Court **GRANTS** Dickerson's motion to suppress. The Government may not use the search fruit, including the vehicle contents, against either Defendant in this case.

## I. Background (largely from DE 50, the hearing transcript)

At 7:34 p.m. on March 25, 2026, Detective Justin Taylor of the Laurel County Sheriff's Office observed a vehicle travelling southbound on Interstate 75 commit a traffic violation by making an improper lane change. He testified that the driver failed to activate the vehicle's turn signal until it was already partially in the adjacent lane, essentially, a tardy signal. Accordingly, he initiated a traffic stop. Taylor admitted such a lapse is common on I-75 and often does not result in a stop. *See* DE 50 at 25.

The vehicle complied with Taylor's directive and pulled over. Taylor approached the vehicle's passenger side. Taylor recognized the vehicle's driver, Dickerson, from a "49'er" gas station encounter just before Taylor started patrolling I-75 southbound. He also testified that he recognized the vehicle's passenger, Wilson, from his prior law enforcement experience as a Pineville police officer.[1] Taylor testified that he did not see Wilson in the vehicle at the gas station, that he did not follow the vehicle from the gas station, and that he did not recognize the vehicle as the one from the gas station when he decided to execute the stop.

Taylor began the stop by explaining to Defendants his reason for pulling them over and inquired regarding their travel. Wilson explained that Dickerson and he were travelling from Wilson's brother's house located in Richmond, KY.[2] Taylor requested that Dickerson provide his driver's license, but he did not have it on his person. Wilson informed Taylor that it was his vehicle and provided valid insurance and registration. Dickerson provided Taylor his name and social security number, then Tayor returned to his police cruiser to run various checks. Taylor testified

[1] This was one of many facts that Taylor included in his testimony but omitted from his case report.
[2] Wilson added that Dickerson would be taking him to the Lexington VA office the following day. Taylor testified that he found it "random" and suspicious that Wilson offered this additional piece of information. It is unclear to the Court why Taylor felt that way; he did not follow up with Wilson.

he did not notice the scent of marijuana, alcohol, or any other substance emanating from the vehicle during this interaction with Defendants.

After returning to his vehicle, Taylor ran a check for a valid license for Dickerson, both individuals' criminal history, and any active warrants. Such check revealed no active warrants and confirmed a valid license for Dickerson. Taylor testified that Dickerson "had some drug possessions and a prior DUI." He omitted this in the case report. Taylor could not recall whether the DUI was a charge or a possession, nor could he recall its date. He also discovered that Wilson had several drug trafficking charges and some convictions, with a trafficking conviction for meth from as recently as 2025.

As Taylor was conducting this database check, Sergeant Zachary Allen of the Laurel Sheriff's Office arrived on the scene. There were discrepancies in Taylor's and Allen's testimony regarding what prompted Allen to appear on the scene. Ultimately, Taylor testified that he made a radio transmission for backup for the purpose of conducting a field sobriety test, and Taylor was the responding officer. Indeed, the record shows that Taylor had decided to test Dickerson immediately after returning to his cruiser. Per examination of Taylor, he called for backup to field test Dickerson at 19:37, only minutes into the call. *See* DE 50 at 63. That testing effort did not actually happen until over thirteen minutes into the call. Again, the case report mentions nothing about DUI suspicion.

Allen was standing next to Taylor's vehicle conferring with Taylor when Wilson requested the attention of the officers, so Allen proceeded to the vehicle. Wilson apparently asked to exit the vehicle and stand, a request Allen denied immediately and without further inquiry. Allen then inquired regarding their travel history. Allen testified that Defendants stated they were coming from the Lexington VA. After a few minutes of cordial back and forth, Allen returned to Taylor's

cruiser. Like Taylor, Allen testified that he did not perceive a smell of marijuana coming from the vehicle during his interaction with Defendants. Allen had told the occupants that officers had already confirmed they had no "warrants or anything" and were just experiencing normal stop protocol.

Once back at Taylor's cruiser, the officers briefly (less than two minutes) conversed with their bodycam audio intentionally muted. Their approach for the entire stop was to mute intra-officer communications but mostly have the audio running for encounters with Dickerson and Wilson. Taylor purportedly suspected possible impairment based on Dickerson's improper lane change and DUI "history." Taylor testified that he had this concern before Allen arrived and before Wilson requested to exit the vehicle. Impairment suspicion does not appear in any report prepared by Taylor or Allen.

Taylor instructed Allen to remove Dickerson from the vehicle and administer a field sobriety test.[3] As such, Allen approached the vehicle's driver's side and instructed Dickerson to exit the vehicle. Dickerson, previously told they were "all good," queried why he was being instructed to exit the vehicle, to which Allen curtly responded, "because I said so." Dickerson, who had been looking at his phone, complied and exited his vehicle. As Allen was removing Dickerson from the vehicle, Taylor was still in his cruiser, located approximately 30 feet away from the subject vehicle, "doing things on [his] computer, as far as running the criminal history and citations" and "glanced up periodically and watched." It was dusk on the early spring evening. Nevertheless, Taylor claims he observed large bulges in both of Dickerson's front pockets as he walked toward the back of Wilson's car. He testified that he could not tell what kind of object

[3] Taylor stated he also had plans to separate Defendants and inquire more into their travel history, given the perceived discrepancy. He referenced that as investigating possible drug trafficking.

Dickerson had. Allen testified that he also noticed a bulge in Dickerson's left pocket as he was removing him from the vehicle.

Allen guided Dickerson to the rear of the vehicle, at that time parked on the shoulder of a busy I-75, and asked him to stand facing Wilson's vehicle and opposite the police lights in preparation for the impending field sobriety test. Dickerson promptly complied with all of Allen's directions. As this was happening, Taylor exited his vehicle and approached Dickerson from behind. Prior to touching Dickerson's pocket, when he was about two to three feet from Dickerson, Taylor testified that he detected marijuana odor.[4] Taylor, speaking very quickly on the body cam video, stated, as best the Court can tell, "hold on for a second…anything…I'm gonna pat you down buddy, make sure you ain't got nothing[.]" Before finishing this statement, and well before Dickerson could have processed the query and formulated a response, Taylor began patting Dickerson's front left pocket. Taylor felt the bulge he claims he previously spotted and asked Dickerson, in immediate succession to the above statement, "what's that, marijuana?" Dickerson responded, "Huh? No sir." Taylor then grabbed Dickerson's arms and detained him.

Once Dickerson was detained,[5] the officers conducted a fulsome search of Dickerson's person. They located a small green plastic sack containing 6 grams of marijuana, a bag of suspected Suboxone pills and a digital scale with suspected meth residue. Officers then removed Wilson from the vehicle, detained him, and performed a search of the vehicle. Officers located and seized, from a concealed void in the trunk, approximately 242 grams of a mixture or substance suspected to contain methamphetamine and approximately 16 grams of a mixture or substance suspected to contain fentanyl.

---

[4] Another hearing surprise: there is no mention of a marijuana odor in any report prepared by Taylor in connection with this incident. The reports also reference no pocket bulges.

[5] Taylor stated explicitly that Dickerson was not under arrest at that point.

On April 23, 2026, a grand jury returned a single-count indictment charging Defendants with possessing with intent to distribute controlled substances, including a mixture or substance containing a detectable amount of fentanyl, and 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, all in violation of 21 U.S.C. § 841(a)(1). *See* DE 1. Defendants now seek to suppress the evidence allegedly underlying the indictment.

## II. Legal Standard

The Fourth Amendment of the U.S. Constitution guarantees the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. amend. IV; *see also California v. Carney*, 105 S. Ct. 2066, 2068 (1985). Generally, a search is "reasonable" under the Fourth Amendment only if it is "conducted pursuant to a warrant issued by an independent judicial officer." *See Carney*, 105 S. Ct. at 2068. Searches conducted without a valid warrant "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 88 S. Ct. 507, 514 (1967); *United States v. Lewis*, 81 F.4th 640, 651 (6th Cir. 2023). The defendant bears the burden of showing a "violation of some constitutional or statutory right justifying suppression." *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003); *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022). However, "the [G]overnment bears the burden of demonstrating an exception to the warrant requirement." *See Mockeridge v. Harvey*, 149 F.4th 826, 835 (6th Cir. 2025) (quoting *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019)).

## III. Analysis

At the outset, the Court briefly writes to address an important consideration bearing on the determinations to follow and shaping the evidentiary record generally: the nature and quality of the evidence presented at the evidentiary hearing. The testimony of officers Taylor and Allen,

Taylor primarily, largely set the stage factually. Such testimony was supplemented by the officers' bodycam, the best evidence, at various points. During key moments, though, the officers deliberately muted their bodycam audio. According to the Laurel Sheriff's Office policy, bodycam audio must be activated when engaging with the public. However, officers have discretion with their audio in any other circumstance, such as when officers are speaking privately with other officers. In this case, the officers chose to mute their audio when they had discretion and keep their internal conversations unknown. This was sanctioned by their office policy, but it does prevent the Court from ascertaining key facts objectively and accurately.

Thus, where there was no bodycam audio, or where the audio was indiscernible due to the noisy, bustling interstate traffic adjacent to the location of the stop, the Court is left to rely on the officers' recollections and narrative of the encounter. But the Court is, based on the full record, wary. The story conveyed has significant credibility concerns, eroding the Court's trust in witness accuracy and credibility.

Let's start with Taylor. His unequivocal testimony was that he suspected Dickerson of impaired driving, which is why he called for reinforcements to aid in conducting a field sobriety test. Yet none of the reports he prepared in connection with the stop mentioned his suspicion of impaired driving or any DUI assessment. An omission of such key information is highly alarming, to say the least. Second, Taylor was asked if Dickerson gave consent to a search. Taylor testified with confusing inconsistency on the topic of consent. Indeed, in the course of the hearing, the Court counts eight distinct and very conflicting stories about whether and how Taylor sought consent from Dickerson. These included version 1 (DE 50 at 16), version 2 (*id.* at 41), version 3 (*id.* at 41), version 4 (*id.* at 43), version 5 (*id.*), version 6 (*id.* at 44), version 7 (*id.*), and version 8 (*id.* at 46). The versions ranged from denying a consent effort to claiming a consent effort over

wildly dissonant versions of language used and suspect reaction. The case report, which one would think is a record of important notes from the case, is silent about consent. Suffice it to say, Taylor's depiction of the frisk event gave this adjudicator no confidence in the telling.

What's more, this all came after Taylor viewed the bodycam footage and had the chance to see exactly what happened. In short, and as discussed in greater detail in its own section, Taylor's position that he received consent to search Dickerson is preposterous, and the Government's decision to pursue this argument despite being given the opportunity to abandon it (and even calling the consent proof not unequivocal) is regrettable.

Next, Taylor claims that he detected the smell of marijuana coming from Dickerson as he approached Dickerson outside his vehicle. However, when asked if he smelled marijuana when he first encountered Defendants sitting in their vehicle, a closed environment much more readily susceptible to capturing odors, he claimed did not. Allen smelled nothing in advance of the search. The Court views this claim of odor, news at the hearing, as plainly implausible and unreliable. Again, the case report is silent as to any marijuana odor and as to any suspicious pocket bulges.

Further, in the KYIBRS Report Narrative, Taylor claims Dickerson, during the pat, was "blad[ing]" his body away from the officers in response to Taylor patting his leg and then engaged in a "brief scuffle." DE 25-3 at 6. The bodycam video plainly contradicts this narrative. Dickerson did not display aggression or resistance during this encounter. The suggestion is a prejudicial mischaracterization of the scene, where Dickerson followed all instructions. Taylor walked up to Dickerson from behind and quickly began searching him. Dickerson did not react in any way that was resistant or qualified as a scuffle. In sum, Taylor's credibility is extremely weak, and the Court treats his testimony accordingly.

Allen was more credible than Taylor, but concerns still exist. Primarily, Allen was asked how Defendants responded to his inquiry into their travel plans. The bodycam depicts one of the Defendants, presumably Wilson, as giving a relatively extended but inaudible answer. But when asked to relay said response, Allen provided only that the occupants said they were coming from the Lexington VA. The true and complete answer clearly included more, yet he could not recall. Allen also briefly contended that he asked for and got consent from Dickerson to submit to a field test; Allen quickly walked that back. *See* DE 50 at 98-99. Ultimately, Allen's secondhand knowledge of key parts and his late arrival make his testimony subsidiary to Taylor's. The Court does note that Allen said that Taylor reported Dickerson as having a prior DUI *conviction,* a matter of later note.

The proof is the foundation for a Court's interpretation of a stop and search. The evidence here is largely splintered, unpersuasive, and of dubious reliability.

**a. Initial Stop**

"A vehicle stop 'constitutes a seizure within the meaning of the Fourth Amendment.'" *United States v. Calvetti*, 836 F.3d 654, 665 (6th Cir. 2016) (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). "Under the Fourth Amendment, officers may stop a car as long as they objectively have probable cause that an occupant of the car has committed a traffic offense, even if they subjectively do so for a different reason." *United States v. Brooks*, 987 F.3d 593, 599 (6th Cir. 2021) (citing *Whren v. United States*, 116 S. Ct. 1769, 1773-76 (1996)). When officers stop a vehicle, all of the vehicle's occupants are "seized" under the Fourth Amendment. *See United States v. Pacheco*, 841 F.3d 384, 389-90 (6th Cir. 2016).

The parties do not meaningfully dispute the propriety of the initial stop. Taylor testified that he observed the vehicle switch lanes without timely activating a turn signal in violation of Ky.

Rev. Stat. Ann. § 189.380. The defense highlighted that Taylor jumbled his words during his initial interaction with Defendants when explaining his reason for stopping them. However, neither Defendant argues that the traffic violation for which Taylor pulled them over did not actually occur. Accordingly, and despite the pervasive credibility concerns, the Court finds that Taylor had probable cause to initiate the traffic stop.

**b. Extension of the Stop[6]**

The "tolerable duration" of a traffic stop is measured relative to the "seizure's 'mission'—to address the traffic violation that warranted the stop[] and attend to related safety concerns.'" *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citation omitted). An officer may, as part of the original mission, make "'ordinary inquiries incident to [the traffic] stop[,]'" *id.* at 1615 (citing *Illinois v. Caballes*, 125 S. Ct. 834, 837 (2005)), including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* The officer must conclude the stop "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 1614. To extend a traffic stop beyond this duration, an officer needs "independent reasonable suspicion" for suspecting criminal activity. *United States v. Peake-Wright*, 126 F.4th 432, 437 (6th Cir. 2025); *Caton v. Salamon*, No. 24-3850, 2025 WL 2888020, at *4 (6th Cir. Oct. 10, 2025) ("We have explained that 'detaining the motorist any longer than is reasonably necessary to issue the traffic citation requires reasonable suspicion that the individual has engaged in more extensive criminal conduct.'") (quoting *Green v. Throckmorton*, 681 F.3d 853, 860 (6th Cir. 2012)).

[6] Dickerson, the driver in lawful possession of the vehicle, and Wilson, the vehicle owner and a passenger, each have Fourth Amendment standing to assert a constitutional challenge as to the propriety of the stop and the duration. *See Byrd. v. United States*, 138 S. Ct. 1518 (2018). The parties acknowledged this at the evidentiary hearing.

The Government concedes that Taylor and Allen extended the stop beyond its original mission, one that by definition includes issues like, as happened with Dickerson, a license verified but not possessed under KRS 186.510. *See* DE 36 at 10 ("The stop was certainly extended, but only after the officers developed reasonable suspicion of other potential criminal activity."). Even if the Government had not conceded the point, the Court would still find that the officers extended the stop.

Taylor testified that he radioed for another officer to assist with administering a field sobriety test, a separate investigation into potential criminal activity not contemplated or within the initial stop. This demonstrates that the stop was extended to investigate independent criminality. More apparently, the stop was extended when Allen ordered Dickerson to exit his vehicle to administer the field sobriety test. This was unrelated to addressing either of the traffic violations, and it did not address a safety concern attendant to the stop. *Rodriguez*, 135 S. Ct. at 1614. Taylor, in charge of the stop, specifically exited his cruiser to involve himself in Allen's interaction with Dickerson; as a matter of logic, that act alone detoured into the new investigative focus and extended the stop.

Both officers expressly relied on *Pennsylvania v. Mimms* in justifying Allen's command to Dickerson to exit the vehicle "because I said so." 98 S. Ct. 330, 333 n.6 (1977). In *Mimms*, the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Id.* In *Rodriguez*, the Supreme Court clarified the rule from *Mimms* as it relates to extending a lawful traffic stop: "The officer-safety interest recognized in *Mimms*, however, stemmed from the danger to the officer associated with the traffic stop itself. On-scene investigation into other crimes, in contrast, detours from the

officer's traffic-control mission and therefore gains no support from *Mimms*." *See Rodriguez*, 135 S. Ct. at 1612. Here, ordering Dickerson out of the vehicle was part of an unrelated detour into a different investigation, not a feature of the catalyzing stop. As such, *Mimms* would not apply. Taylor waited over 13 minutes to have Dickerson removed, and he did so not as part of any normal protocol, but rather for the specific purpose of investigating DUI. That is not *Mimms*.

The Government contends that the officers had reasonable suspicion to extend the stop beyond the original mission. "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Smith*, 140 F.4th 316, 319 (6th Cir. 2025) (citing *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011)). Reasonable suspicion is "not an onerous standard." *United States v. Cortez*, 965 F3d 827, 834 (6th Cir. 2020). It is less than probable cause, "and it falls considerably short of satisfying a preponderance of the evidence standard." *Calvetti*, 836 F.3d at 666. It does, however, require more than a "mere hunch." *Id.* In considering the totality of the circumstances, officers may consider their "own observations as well as information the officer receives from police reports, dispatch, and fellow officers." *United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022). The reasonable-suspicion determination involves "commonsense judgments," "inferences about human behavior," and inferences drawn from the officer's "experience and specialized training." *Id.* Courts must "take the facts together" in determining whether there was reasonable suspicion. *Id.*

Two theories for extending the stop emerged from the Government's brief and the testimony given at the evidentiary hearing. The Court analyzes each theory in turn.

### 1. Driving Under the Influence

First, and the Court would say primarily, Detective Taylor testified that he suspected that Dickerson was driving under the influence. The circumstances contributing to this suspicion were limited to the observed improper lane change and Dickerson's DUI "history." These facts, taken together, did not provide Taylor with reasonable suspicion that Dickerson was driving under the influence.

The first factor Taylor relied on was the improper lane change. There are certain erratic driving maneuvers, such as "weaving all over the roadway," that may be indicative of or correlated with impaired driving. *See Navarette v. California*, 134 S. Ct. 1683, 1690-91 (2014) (collecting cases). However, Taylor agreed that the traffic violation he observed—switching lanes without timely activating the turn signal—is a "very common occurrence" on the interstate and that he has encountered "many motorists that didn't use their turn signal" when switching lanes in his interstate patrol experience.

The improper lane change observed in this case is not reasonably indicative of impaired driving. Indeed, Taylor, who had left the same 49'er gas station and followed the same path as Dickerson, explicitly agreed that he did not observe any erratic driving from Dickerson—he did not swerve, speed, cross the fog line, or perform any sort of move that could be reasonably classified as erratic. The tardy signal was a minor and commonplace traffic violation. Absent "other indicia" of impaired driving, "the 'failure to follow a perfect vector down the highway' is not enough to suspect a person of driving while impaired." *United States v. Warfield*, 727 F. App'x 182, 187 (6th Cir. 2018) (quoting *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000)). Thus, Dickerson's failure to perfectly heed all traffic laws is not a signal of impaired driving. His

car was partially in the new lane when he flipped on his blinker. Violative? Yes. Indicative of intoxication? No.

And importantly, Taylor had actually observed Dickerson back at the gas station. There, he saw no behavior suggesting impairment. *See* DE 50 at 81. Further, he did not testify to conduct on the scene that contributed to any suspicion of DUI. This all further modifies the import of the late signal.

Dickerson's "DUI history" does not move the needle. As explained above, Taylor could not recall whether the prior DUI in question was a charge or a conviction, nor could he recall when that purported DUI occurred. Allen testified that Taylor told him, on site, that Dickerson had a prior *conviction*. Given the spotty credibility in testimony, the Court looked back at Dickerson's bond report, because a charge is very different from a conviction. That report, which the Court will make a sealed exhibit, reveals that Dickerson faced a DUI charge in March of 2014, but the charge was dismissed in December of that year. A suspect's criminal history cannot, on its own, provide the requisite suspicion to extend a stop. *See Stepp*, 680 F.3d at 667. It is, however, one factor to consider, and it "may cast a suspicious light on other seemingly innocent behavior." *Id.* But adding criminal history "to the mix is insufficient to establish reasonable suspicion" when combined with only "weak indicators." *United States v. Taylor*, 121 F.4th 590, 597 (6th Cir. 2024). Obviously amplifying this sentiment is the fact that Dickerson's "DUI history" was only an arrest, from a dozen years before the stop, that did not result in conviction. An arrest establishes only that the Government once had probable cause to believe that Dickerson drove impaired. The Court will not condone allowing one aged prior accusation of wrongdoing to serve as an objective basis for suspected current criminal activity.

Thus, based on the totality of the circumstances and viewing the factors in the aggregate, the Court finds that there was not a "particularized and objective basis" to believe that Dickerson was driving under the influence. *See Peake-Wright*, 126 F.4th at 437. The two factors relied on by Taylor—an isolated improper lane change and a prior DUI arrest—fall well short of this standard. Accordingly, insofar as Taylor extended the traffic stop due to suspicion of impaired driving, the extension was an impermissible seizure in violation of Defendants' rights under the Fourth Amendment.[7]

**2. Drug Activity**

In its response to Dickerson's suppression motion, the Government contended that the officers' reasonable suspicion of drug trafficking was the basis for extending the stop. *See* DE 36 at 10-11. Taylor did testify to this effect during the Government's examinations, often in response to overtly leading questions. *See* DE 50 at 14, 16-17, 78. However, when examined by the defense, Taylor explained that it was primarily the suspicion of impaired driving that led to the extension. *See id.* at 31. Allen's testimony corroborated the impaired driving suspicion theory. *See id.* at 94 (confirming direction to conduct field sobriety test, though Allen noted no sign of intoxication). Based on a comprehensive viewing of the testimony and considering the officers' credibility, the record strongly indicates that the true basis for the extension was suspicion of impaired driving. Nevertheless, the Court will entertain the amorphous drug activity suspicion offered by the Government.

[7] Troublingly, Taylor testified that he did not need reasonable suspicion to conduct field sobriety testing of Dickerson. *See* DE 50 at 49. This, like Taylor's blurry and shifting views on consent, creates worry. *Klaver v. Hamilton Cnty., Tenn.*, No. 22-5083, 2022 WL 16647970, at *6 (6th Cir. Nov. 3, 2022) ("Certainly officers may detain a driver for things like questioning or field-sobriety tests if they have a reasonable suspicion that the driver is, for example, operating a vehicle under the influence of drugs.").

The Government argued that the following factors formed reasonable suspicion of criminal activity, namely suspicion of drug trafficking: (1) Dickerson did not have his driver's license on his person; (2) Wilson's criminal history involved drug offenses, including a recent meth trafficking conviction; (3) Wilson's request to exit the vehicle; and (4) inconsistent travel stories.[8]

In *United States v. Walton*, cited by the Government, the Sixth Circuit included as a factor in the reasonable suspicion analysis that the "defendant's uncle did not have a driver's license, although defendant said he 'had taken turns driving.'" 258 F. App'x 753, 758 (6th Cir. 2007). This case is of questionable applicability because Taylor promptly confirmed that Dickerson did have a driver's license that was valid; he simply did not have it on his person. In any event, the other three factors noted by the Sixth Circuit fairly obviously carried more significance in *Walton*. Thus, the Court affords this factor very minimal weight, if any, as it relates to suspicion of drug activity. Dickerson was not in compliance with the licensure laws; that is a low tether to suspicion of trafficking conduct.

As explained earlier, a criminal history featuring drug convictions, including a recent trafficking conviction, can certainly contribute to the reasonable suspicion foundation, though it is not enough to create reasonable suspicion. *See Stepp*, 680 F.3d at 667. Where, as here, the criminal history is "specific and related to the same suspicions that the officer was developing—that the occupants of the vehicle might be involved in drug trafficking," it is a proper factor to consider as "cast[ing] a suspicious light on other seemingly innocent behavior." *Id.*

---

[8] In its brief, the Government argued that Dickerson and Wilson were travelling from known "source areas." The Government adamantly argued that Taylor testified to this effect during the evidentiary hearing. That is inaccurate. Taylor did not testify that Lexington and/or Richmond are drug source areas. Plainly, the Government may not rely on something omitted from the record. The prosecutor, creditably, acknowledged that in a post-hearing notice. DE 51.

As for the third factor, Taylor and Allen found Wilson's request to exit the vehicle to be abnormal, what Allen called "a little bit" unusual. DE 50 at 85. Further, they, relying on "training and experience," perceived the request as a possible attempt by Wilson to distance himself from whatever might have been in the vehicle. The Court credits that it was an atypical request from an occupant of a vehicle stopped on the interstate. However, the Court struggles to understand the officers' interpretation of the request. Immediately at the stop, Wilson admitted to Taylor that the vehicle belonged to him; he provided the registration from the jump. There is low logic in the view that an owner would see a legal benefit, in terms of culpability, in standing outside his own vehicle. Neither officer detailed the foundation beyond the catchphrase "training and experience." Allen did not query Wilson on his request, and the audio from inside the car is largely indiscernible. Did Wilson need to stretch a bad back? Did he want the chance to smoke? Unknown. The officers, like they did with most of Defendants' conduct throughout the encounter, simply stamped the request as suspicious and proceeded to the next step.

The Government also argues that Defendants' inconsistent travel report contributed to reasonable suspicion of drug activity. "In the reasonable-suspicion analysis, we have afforded significant weight to conflicting or implausible explanations of travel plans in some cases." *Taylor*, 121 F.4th at 595; *see also Stepp*, 680 F.3d at 666. In response to Taylor's inquiry, which preceded Allen's, Wilson explained that Defendants were coming from seeing Wilson's brother in Richmond, KY[9], and that Dickerson would be taking him to the VA the following day. Later, Defendants apparently told Allen that they were coming from the Lexington VA. Though not identical, the Court does not view these travel plans as inconsistent per se. They are certainly not suspiciously conflicting, implausible, or "a stark contrast" as the Government coins it. It is entirely

[9] Taylor's report verbiage was that Wilson said they had "just left Richmond, KY, after visiting his brother." DE 25-3.

possible that they travelled from both Lexington and Richmond before being stopped by Taylor. Richmond is located between Lexington and London; they may have stopped in Richmond on their way home from Lexington. Taylor says Wilson told him they had "just" left Richmond, and he offered they were going to the VA the next day. Taylor viewed that nugget as odd, but when Allen later circled back, Dickerson confirmed that they had been at the Lexington VA on the day of the stop and then had seen Wilson's brother in Richmond. *See* Allen Bodycam, at 10:56; *see also United States v. Richardson*, 385 F.3d 625, 631 (6th Cir. 2004) ("Also, the allegedly conflicting explanations of their travel plans are not mutually exclusive; it is entirely plausible that the group traveled both to see a doctor and a lawyer."). Taylor, it seems, treated every angle of interaction as suspicious. Though there was slight incongruity in the information from the car, Allen could not say who spoke to him, and the geography and collective circumstance is only mildly misaligned. Contrast this with *United States v. Williams*, 68 F.4th 304, 308 (6th Cir. 2023), where "dubious travel plans" were a weighty reasonable suspicion factor. There, the travelers were 19 hours from their local rental car location, were several hours off the direct route between origin and alleged destination, and told stories that included both being on vacation and being on a work trip. *See id.* This case is not within the same realm of dubiety.

Considering the totality of the circumstances, the stated factors amounted to no more than an ill-defined hunch of amorphous drug activity that did not rise to the level of reasonable suspicion. *See Stepp*, 680 F.3d at 664. Taylor recognized Wilson from his days as a Pineville policeman, and he "had suspicion of Mr. Wilson" because of that knowledge. *See* DE 50 at 10, 21, 64. Taylor gave no details of that prior knowledge or the foundation of that suspicion. This record tells the Court that Taylor had a hunch based on some prior information, and he tried to fit

the stop specifics into a basis for a drug investigation. The *Terry* bar is not especially taxing, but it is a bar set by the Constitution itself.

There must be a particularized and *objective* basis for suspected wrongdoing, and the totality must *reasonably* warrant the liberty intrusion imposed. *Green*, 681 F.3d at 860-61. Taylor's report, contrasted with his testimony, is an amalgam of matters both misstated (describing a "scuffle" and Dickerson "blading") and omitted (marijuana odor, prior knowledge of Wilson, DUI investigation, Dickerson's pocket bulges, pat-down consent). Plainly, the officer had a subjective view of Wilson and then sorted event kernels to suit his hunch. This does not suffice as reasonable suspicion. The Court finds the stop here improperly extended. Each Defendant was under an improper seizure at the time of the Dickerson search. As such, the Court holds that the prolongation of the traffic stop was unconstitutional, and this improper extension constitutes a violation of Dickerson's and Wilson's Fourth Amendment rights, as both were "seized" within the meaning of the Fourth Amendment. *Pacheco*, 841 F.3d at 389-90.

Given the grave need to deter deliberate and flagrant Fourth Amendment violations, the Court holds that the exclusionary rule easily applies in this case to suppress the evidence as to both Defendants. *See Herring v. United States*, 129 S. Ct. 695, 700 (2009). No exception to the rule saves the subsequent search and resultant tainted fruits. *See United States v. Waide*, 60 F.4th 327, 338 (6th Cir. 2023). On consideration of the full record, and the conduct of and processes of the involved officers, the benefits of deterrence from suppression here outweigh the costs.

**c. Search of Dickerson's Person**

Even if the officers had reasonable suspicion of other criminal activity warranting further detention, the Government has not demonstrated that an exception to the warrant requirement justified the warrantless *Terry* search of Dickerson's person. Dickerson did not give consent to a

search, and the officers did not have reasonable suspicion that Dickerson was armed and dangerous. Therefore, the officers' warrantless search of Dickerson's person—beginning with the pat-down—violated Dickerson's right to be free from unreasonable search and seizure under the Fourth Amendment, and the exclusionary rule would prohibit the Government's use of any resulting search fruits as to Dickerson. The rights afforded by the Fourth Amendment are personal and "may not be vicariously asserted." *United States v. Noble*, 762 F.3d 509, 526 (6th Cir. 2014) (quoting *Alderman v. United States*, 89 S. Ct. 961, 967 (1969)). Thus, Wilson would not have Fourth Amendment standing to challenge this violation or suppress the evidence discovered in the eventual vehicle search based on this violation. This is an alternative holding in Dickerson's favor.

**1. Consent**

Taylor testified, and the Government argues, that Dickerson consented to the *Terry* search of his person. A warrantless search "authorized by consent is wholly valid." *Schneckloth v. Bustamonte*, 93 S. Ct. 2041, 2045 (1973). To show effective consent, the "prosecutor bears 'the burden of proving that the consent was, in fact, freely and voluntarily given.'" *United States v. Cowan*, 704 F. App'x 519, 522 (6th Cir. 2017) (quoting *Bumper v. North Carolina*, 88 S. Ct. 1788, 1792 (1968)). The showing requires clear and positive testimony. *See United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020). Consent exists only when it is "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1996). The prosecutor may show consent "in the form of words, gesture, or conduct." *Lawson v. Creely*, 137 F.4th 404, 419 (6th Cir. 2025). The Government's burden "cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper*, 88 S. Ct. at 1792.

The Court will briefly rehash the setting and sequence, all on the shoulder of I-75. Dickerson was standing behind his vehicle and facing away from the blue lights. Taylor approached Dickerson from his rear. Once within arm's reach of Dickerson, Taylor stated, "hold on for a second…anything…I'm gonna pat you down buddy, make sure you ain't got nothing[.]" Taylor was touching/patting Dickerson's front left pocket before Dickerson could react or formulate a response. Taylor then asked, "what's that, marijuana?" Taylor then proceeded to detain Dickerson, and the officers jointly conducted a search of Dickerson's person.

Precisely what Taylor said is unclear, because, in violation of Department policy, he had the audio muted on his bodycam. Thus, only Allen's camera had audio from the very loud surrounding scene.[10] Again, Taylor's many formulations of what he said surely add equivocation to the record. Fortunately, Allen's recording dispels most of that, breaking in Dickerson's favor.

As mentioned earlier, any suggestion that Dickerson consented to a search of his person is simply baseless and borderline ridiculous. The bodycam video captures the purported consent, and the video was played for Taylor before he answered questions about it. Nevertheless, Taylor's testimony repeatedly contradicted the encounter depicted in the video. For example, Taylor first testified that he asked Dickerson if he could pat him down for weapons, which is not consistent with the video. He subsequently clarified that he asked Dickerson if he had anything illegal on his person, which is also not consistent with the video. It wasn't until counsel for Dickerson quoted Taylor verbatim that Taylor confirmed the true words said. After this clarification, Taylor started to agree that he did not get consent to search. However, he quickly backtracked and went to a new line of reasoning. He claims Dickerson said "No" (as in, no objection, it seems) and then put his hands up, a perceived gesture of consent. Again, the bodycam footage plainly refutes Taylor's

[10] So loud that Taylor said he had to retreat to his car because it is difficult to hear anything roadside. *See* DE 50 at 10. This added to the chaotic moment when Taylor approached Dickerson from behind.

version of the events. Dickerson simply did not raise his arms as Taylor claimed. And the only *question* Taylor asked Dickerson was if the bulge was marijuana, so Dickerson's "no" reasonably goes to this question, not to an inquiry of any opposition to a search (which is the only way "no" could be interpreted as giving consent). Regardless, Allen's bodycam shows that Taylor was already feeling Dickerson's pocket before Taylor finished making the above statement. And the statement was exactly that: a statement, not a question. In essence, Taylor said, "I'm going to pat you down." Taylor did not ask Dickerson for consent. He told Dickerson that he was going to search him and then did what he said. On this record, there can be no argument that there was unequivocal consent. *See Bumper*, 88 S. Ct. at 1792.

In the arguments of counsel that followed the testimony at the evidentiary hearing, the prosecutor stated, "Now, I think that it's arguable whether or not he consents to the pat-down. I've watched the video more times than I care to…Is it unequivocal consent? I don't know that I can say that." The Court reminded the prosecutor that unequivocal consent is the unequivocal standard. *Worley*, 193 F.3d at 386. It is dismaying for the Government to cling to such a slender reed.

**2. *Terry* Frisk**

As an alternative to consent, the Government argues that the officers had reasonable suspicion that Dickerson was armed and dangerous. An officer may conduct a warrantless search for weapons where the officer has reasonable suspicion that he or she is "dealing with an armed and dangerous individual." *Terry v. Ohio*, 88 S. Ct. 1868, 1883 (1968); *see also Noble*, 762 F.3d at 521. Again, reasonable suspicion is based on the totality of the circumstances. *See Noble*, 762 F.3d at 521. "[I]t exists if 'a reasonably prudent [person] in the circumstances would be warranted

in the belief that his [or her] safety or that of others was in danger.'" *Id.* at 521-22 (quoting *Terry*, 88 S. Ct. at 1883).

The Government contends that such reasonable suspicion existed based on the bulge in Dickerson's front pockets and Dickerson's "nervous" behavior. The Court rejects this foundation as supplying reasonable suspicion that Dickerson was armed and dangerous.

As to the bulge (or bulges, in both pockets), Taylor initially testified that, based on his training and experience, he thought the bulge may "possibly" have been a weapon. DE 50 at 17, 42. He gave no further explanation on why he suspected the bulge was a weapon. Indeed, he agreed he could not tell what kind of object was in Dickerson's pocket. *See id.* at 41. He did not testify that the bulge resembled the shape of a weapon. He gave no training- or experience-based opinion that, whatever he suspected might be afoot, Dickerson might be armed and dangerous as a result. And further, Taylor claimed he glanced up and saw the bulges from his cruiser, at dusk, 30ish feet away. He also claimed he saw Dickerson "reach down in his pockets" when he stepped out of the car. That is fiction. Dickerson had a phone in one hand, and the video shows no instance of him reaching down in either pocket. And to go back to the common refrain, Taylor included none of this in his report.

Courts must "afford due weight to reasonable inferences that officers may draw from a given situation in light of their training and experience." *United States v. McMullen*, 103 F.4th 1225, 1230 (6th Cir. 2024). But an officer's invocation of training and experience does not magically transform an otherwise innocent observation into particularized suspicion. Pockets are designed to carry objects, and the natural result of placing almost any object in a pocket is a bulge. Thus, the mere observation that a person's pocket contains something says remarkably little about whether that person possesses a weapon. In *United States v. Davis*, the Sixth Circuit explained

that a bulge "may have been a cell phone, wallet, or store purchases." 554 F. App'x 485, 490 (6th Cir. 2014). The Circuit held that such ambiguity left the officers without reasonable suspicion. *See id.* Such is also the case here. The presence of a bulge in one or both of Dickerson's pockets is afforded little weight in the reasonable suspicion analysis.

Taylor also suspected Dickerson may be armed and dangerous based on Dickerson's behavior after being requested to exit the vehicle. The Government dramatically portrays Dickerson as acting "very nervous and somewhat erratic." DE 36 at 3. However, the bodycam video undermines this argument entirely. In Taylor's first interaction with Defendants, Taylor stated that "everything was coming back good, you should be alright." He repeatedly stated, "you're good." A few minutes later, Allen assured Defendants that they "didn't have any outstanding warrants or anything" and that the officers were "just doing typical protocol stuff."

Based on these interactions, it quite reasonably would cause Dickerson some immediate confusion or concern when Allen ordered him to exit the vehicle just a few minutes after first speaking to him. Dickerson responded as an ordinary person would under the circumstance by pausing and inquiring. Allen testified that Dickerson was displaying signs of nervousness by being on his phone and fidgeting his hands. Taylor, the searching officer, could not have witnessed this behavior (which the video, other than showing that Dickerson held a phone, hardly proves) from his position, and it is his suspicion that is relevant. The Government cannot impute knowledge to Taylor after the fact. *See United States v. Lyons*, 687 F.3d 754, 768 (6th Cir. 2012) (explaining the collective-knowledge doctrine and distinguishing where officers act ignorant of information possessed by other officers). But even if Taylor had seen exactly what Allen had, the Court still would not join in describing Dickerson's behavior as nervous and erratic.

This is also true for Dickerson's behavior once he exited the vehicle, which Taylor plausibly could have seen. Dickerson emerged from the car within seconds of Allen's unambiguous order. Dickerson obeyed Allen's commands: he walked to the back of Wilson's vehicle, turned around, and faced that vehicle as directed. He respectfully asked what he did wrong. And he allowed Allen to remove his hat. None of this behavior could reasonably be construed as nervous or erratic. In any event, "nervousness—even extreme nervousness—'is an unreliable indicator' of someone's dangerousness, 'especially in the context of a traffic stop.'" *Noble*, 762 F.3d at 522 (citing *Richardson*, 385 F.3d at 630). Accordingly, this factor also carries very little weight.

In *Noble*, the Sixth Circuit was faced with three factors to support a *Terry* frisk: the defendant's nervousness, suspicion that the vehicle was connected to methamphetamine trafficking, and the officer's understanding, based on training and experience, that "subjects that are involved in narcotics more times than not will carry a weapon to protect themselves." *Id.* (cleaned up). The Sixth Circuit found that these factors did not combine to achieve reasonable suspicion that the defendant there was armed and dangerous. *Id.* at 524. The factors offered by the Government here, from any objective sifting, are much weaker.

The notes about suspicion of trafficking apply here as well. While Wilson did have a recent trafficking conviction, Dickerson's record revealed no such activity. Indeed, the lone drug conviction for Dickerson was a misdemeanor marijuana possession offense from 2000, and Taylor relayed no record of violence or gun crimes. The Government marshalled very little to support any suspicion that Dickerson was both armed and dangerous, and the proof fell far short of the *Terry* mark.

Accordingly, the Court holds that Taylor did not have reasonable suspicion that Dickerson was armed and dangerous, based on the totality of the circumstances. Thus, the warrantless search of Dickerson's person violated his right to be free from unreasonable searches as guaranteed by the Fourth Amendment. The rule of law applies to all, and suppression is the apt remedy for this instance of plain and deterrable government overreach.

## IV. Conclusion

For the stated reasons, the Court **GRANTS** Dickerson's motion to suppress, DE 25, in which Wilson joined, *see* DE 32; DE 34. Evidence obtained from the search of Dickerson's person and resultingly Wilson's vehicle shall be suppressed, as to both Defendants, from the Government's case-in-chief.

This the 4th day of September, 2026.

**Signed By:**
***Robert E. Wier***
**United States District Judge**